**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| BRYAN SCHWITZKE AND MADELIN SCHWITZKE, | ) ) ) | Case No. 2:26-cv-1986-RMG |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| ZIMMER BIOMET HOLDINGS, INC., BIOMET, INC., ZIMMER, INC., BIOMET ORTHOPEDICS, LLC, BIOMET MANUFACTURING, LLC, JOHN DOE 1–10, AND JOHN DOE CORPORATIONS 1-10; | ) ) ) ) ) ) ) ) ) | (Jury Trial Demanded) |
| *Defendants*. | ) | |

**TO: THE ABOVE-NAMED DEFENDANTS AND ALL COUNSEL OF RECORD**

Plaintiffs Bryan Schwitzke and Madelin Schwitzke, by and through their undersigned counsel, upon information and belief, and at all times hereinafter mentioned, hereby allege and state as follows:

**PARTIES**

1. Plaintiffs Bryan Schwitzke and Madelin Schwitzke ("Plaintiffs") are citizens and residents of Dorchester County, State of South Carolina.

2. Defendant ZIMMER BIOMET HOLDINGS, INC. is a Delaware corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana 46580. At all relevant times, Zimmer Biomet Holdings, Inc. was the parent and controlling entity of the Zimmer Biomet enterprise and was engaged in the design, manufacture, marketing, distribution, promotion, and sale of the "Comprehensive Reverse Shoulder System", a prosthetic device used in reverse shoulder replacement procedures ("the Device").

1

3. Defendant BIOMET, INC. is an Indiana corporation with its principal place of business in Warsaw, Indiana 46580 and is a wholly owned subsidiary of Zimmer Biomet Holdings, Inc. with a registered agent located at 100 Coastal Drive, Suite 210, Charleston, SC 29492.

4. At all relevant times, DEFENDANT BIOMET, INC. was engaged in the design, manufacture, marketing, distribution, promotion, and sale of the Device.

5. Defendant ZIMMER, INC. is an Indiana corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana 46580, and at all relevant times participated in the design, manufacture, distribution, marketing, promotion, and sale of the Device.

6. Defendant BIOMET ORTHOPEDICS, LLC, is an Indiana limited liability company, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant BIOMET, INC., with its principal place of business in Warsaw, Indiana.

7. Defendant BIOMET ORTHOPEDICS, LLC, conducts business in the State of South Carolina and is engaged in the design, manufacture, marketing, promotion, and/or sale of the Device.

8. Defendant BIOMET MANUFACTURING, LLC (a/k/a Biomet Manufacturing Corporation) is an Indiana limited liability company with its principal place of business at 345 East Main Street, Warsaw, Indiana 46580, and at all relevant times, designed, manufactured, distributed, marketed, promoted, and sold the Device.

9. Defendant BIOMET MANUFACTURING, LLC conducts business in the State of South Carolina and can be served with process through its registered agent, Corporation Service Company, located at 100 Coastal Drive, Suite 210, Charleston, SC 29492.

10. Defendants JOHN DOE 1–10 and JOHN DOE CORPORATIONS 1-10 are fictitiously named individuals and entities whose true identities are presently unknown but who participated in the design, manufacture, distribution, marketing, promotion, and/or sale of the Device. Plaintiffs will amend this Complaint to identify John Doe Defendant(s) upon discovery of their true identities.

11. Defendants ZIMMER BIOMET HOLDINGS, INC., BIOMET, INC., ZIMMER, INC., BIOMET ORTHOPEDICS, LLC, and BIOMET MANUFACTURING, LLC a/k/a BIOMET MANUFACTURING CORP. are collectively referred to herein as "Zimmer Biomet" or "Defendants".

12. At all times relevant hereto, Defendants were the agents of each other, and in doing the things alleged herein, each Defendant was acting within the course and scope of its agency and was subject to and under the supervision of its codefendants.

13. Upon information and belief, at all times herein mentioned, the employees of all Defendants, their subsidiaries, affiliates, and/or other related entities, as well as the employees of the Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants and employees of Defendants, and at all relevant times, were acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of Defendants, such allegations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of the Defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Defendants while actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15. Pursuant to 28 U.S.C. §1391(b), venue is proper in the United States District Court for the District of South Carolina.

16. Defendants have significant contacts with the District of South Carolina such that they are subject to the personal jurisdiction of this Court.

## NATURE OF THE CASE

17. This is a products liability action arising from the defective design, manufacture, distribution, promotion, and/or sale of the Biomet Comprehensive Reverse Shoulder System, including the Glenosphere Mini Baseplate with Taper Adapter (Part No. 010000589, Lot No. 730010), the Mini Humeral Stem (Part No. 113635, Lot No. 65095332), the Versa-Dial Reverse Shoulder Glenosphere Standard Offset 40mm (Part No. 110030776, Lot No. 65311894), the Mini Humeral Tray, Standard Thickness, 40mm, 40mm Taper Offset (Part No. 110031399, Lot No. 65312045), the Vivacit-E Highly Crosslinked Polyethylene Bearing, Standard, 40mm (Part No. 110031427, Lot No. 64580943), the Central Screw (Part No. 115396, Lot No. 578600), and associated non-locking screws (collectively, the "Device"), all bearing the Zimmer Biomet trade name and designed, manufactured, marketed, promoted, distributed and sold by Defendants.

18. Plaintiffs' claims are not pre-empted by the Medical Device Amendments of 1976 (MDA), 21 U.S.C.§360(c), et seq. as Biomet Comprehensive® Reverse Shoulder is a Class II Device, approved pursuant to the FDA 510(K) process in 2008, and not through the FDA "Premarket Approval" process.

4

19. On January 4, 2023, Plaintiff underwent a reverse left total shoulder arthroplasty, and the Device was implanted in Plaintiff's left shoulder. No complications were reported during the surgery.

20. Within less than four months of implantation, Plaintiff began experiencing increasing pain and discomfort in his left shoulder. Following examination, Plaintiff Bryan Schwitzke was advised the Device failed.

21. As a result of the failure of the Device, Plaintiff had to undergo revision surgery to remove and replace the defective device in attempt to restore function to his shoulder. Plaintiff's revision surgery occurred on June 29, 2023.

**FACTUAL ALLEGATIONS**

**A. THE DEVICE**

22. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

23. Defendants designed, manufactured, marketed, promoted, sold, and distributed the Biomet Comprehensive Reverse Shoulder System as a reverse total shoulder arthroplasty implant system. The Glenosphere Mini Baseplate with Taper Adapter (Part No. 010000589) is a porous plasma coated titanium component designed to be secured to the glenoid bone through osseous integration (bone ingrowth into the porous plasma surface) providing biological fixation.

24. Part No. 010000589: the Glenosphere Mini Baseplate with Taper Adapter that was implanted in Plaintiff's left shoulder was the subject of two separate FDA recalls: FDA Recall Z-1208-2015 (January 2015, Class II), in which Biomet recalled Part No. 010000589 because the taper adapter (the component connecting the glenosphere to the baseplate) was missing from packaging; and FDA Recall Z-1615-2020 (February 2020, Class II), in which Biomet again recalled Part No. 010000589 due to a packaging and process control failure. These recalls establish

5

that Defendants had actual, documented notice of recurring defects with regard to this specific component prior to the implantation of Plaintiff's Device.

25. The broader Biomet Comprehensive Reverse Shoulder System has been the subject of additional recalls, including a 2010 Class II recall and a February 2017 Class I recall (the most serious FDA recall classification, reserved for products with a reasonable probability of causing serious adverse health consequences or death) due to a higher-than-expected rate of device fracture.

26. Prior to the implantation of Plaintiff's Device, Defendants received multiple adverse event reports regarding failures of the Biomet Comprehensive Reverse Shoulder System, including reports of glenosphere dislocation and baseplate loosening with Part No. 010000589, as reflected in the FDA's MAUDE adverse event database.

27. Upon information and belief, Defendants conducted post-market clinical surveillance specifically tracking glenoid loosening and adverse events with the Biomet Comprehensive Reverse Shoulder Mini Baseplate system and possessed internal data regarding the rate of osseous integration failure with this component prior to Plaintiff's surgery on January 4, 2023.

## B. PLAINTIFF'S SURGERY AND DEVICE FAILURE

28. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

29. On January 4, 2023, Plaintiff underwent surgery on his left shoulder at Lowcountry Orthopedics and Sports Medicine located in Charleston, South Carolina, during which Dr. Zimlich performed a reverse left total shoulder arthroplasty and implanted the Biomet Comprehensive Reverse Shoulder device.

6

30. Reverse total shoulder arthroplasty ("RTSA") is performed to treat rotator cuff tear arthropathy and other rotator cuff dysfunctions.

31. No complications were reported during the surgery.

32. At all times relevant, the Device was used in a foreseeable manner.

33. Within less than four months of implantation, Plaintiff began experiencing increased pain and discomfort in his left shoulder while engaged in ordinary therapy and activity consistent with the expected post-operative activity for a reverse total shoulder arthroplasty patient.

34. On May 16, 2023, Plaintiff Bryan Schwitzke reported to Dr. Zimlich for further evaluation.

35. X-ray imaging was conducted and confirmed mechanical hardware failure of the Device, including a loose glenoid baseplate and fractured screws.

36. Plaintiff's treating surgeon determined that the Device failed as it did not achieve osseous integration with the glenoid bone, causing the glenoid construct to become progressively loose and the fixation screws to fracture under mechanical stress.

37. Dr. Zimlich advised Plaintiff that the Comprehensive Reverse Shoulder implant in his left shoulder had failed and that he would need revision surgery.

38. On June 29, 2023, Plaintiff underwent revision surgery at Lowcountry Orthopedics to remove and replace the Biomet Comprehensive Reverse Shoulder prosthesis that had been implanted into Plaintiff's left shoulder on January 4, 2023.

39. Intraoperative findings and inspection confirmed the glenosphere was grossly loose and was removed intact together with the glenosphere baseplate and screw heads as a single detached assembly; the central screw was fractured in multiple locations; and a bone defect was present in the glenoid requiring allografting. Post-removal examination of the explanted components

revealed extensive fretting corrosion on the porous plasma surface of the glenoid baseplate, consistent with chronic micromotion from failed osseous integration.

40. The Device was defective and unreasonably dangerous when it left Defendants' control, and those defects were a direct and proximate cause of Plaintiff's injuries.

41. As a direct and proximate result of the defective Device implanted into Plaintiff's left shoulder, Plaintiff has suffered and incurred severe personal injuries and damages including, but not limited to, physical injuries and bodily impairment, emotional distress and mental anguish; past, present, and future pain and suffering; past and future medical and rehabilitation expenses; loss of earnings and earning capacity; loss of enjoyment of life; permanent disfigurement; and permanent physical impairment.

**FOR A FIRST CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY**
**AS TO ALL DEFENDANTS**

42. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

43. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, marketed, sold, and/or distributed the Device that was surgically implanted in Plaintiff's left shoulder on January 4, 2023.

44. At all relevant times, the Device was in an unsafe, defective, and inherently dangerous condition for users such as Plaintiff that had the Device surgically implanted.

45. The Device was in an unsafe, defective, and inherently dangerous condition at the time it left Defendant's possession and control.

8

46. At all times herein mentioned, the Device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

47. The Device's unsafe, defective, and inherently dangerous condition was a cause of injury to Plaintiff.

48. The Device failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

49. Plaintiff's injuries resulted from use of the Device that was both intended and reasonably foreseeable by Defendants.

50. At all times herein mentioned, the Device posed a foreseeable risk of danger inherent in the design which greatly outweighed the benefits of that design.

51. At all times herein mentioned, the Device was defective and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

52. At all times herein mentioned, the Defendants knew, or should have known, that the Device was in a defective condition and was and is inherently dangerous, unsafe and knew the Device would not be inspected for defects prior to its implantation into patients such as Plaintiff.

53. At the time of the implantation of the Device into Plaintiff, the aforesaid product was being used for the purposes and in a manner normally intended, namely for use as a reverse shoulder replacement device.

54. Defendants had a duty to design, research, manufacture, test, market, and distribute a product that was not unreasonable dangerous for its normal, intended use.

9

55. Plaintiff was a person who would reasonably be expected to use the Device that Dr. Zimlich implanted into his left shoulder on January 4, 2023.

56. The Device was being used in a foreseeable manner at the time it failed.

57. A feasible, alternative design existed that was capable of preventing Plaintiff's injuries and were known or reasonably should have been known to Defendants.

58. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective and unreasonably dangerous product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to Plaintiff, in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

59. The Device was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Device created a high risk of bodily injury and serious harm. Defendants failed to adequately and timely warn consumers of this risk.

60. The defective and unreasonably dangerous condition of the Device implanted into Plaintiff's left shoulder and Defendants' failure to warn of the Device's defects and risks of improper functioning were a direct and proximate cause of Plaintiff's injuries and damages.

61. As a direct and proximate result of Defendants' defective and unreasonably dangerous Device, Plaintiff experienced and/or will experience severe harmful effects including but not limited to, loss of range of motion as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and suffering, emotional distress and mental anguish, including diminished enjoyment of life.

62. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the safety of recipients of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, and/or inform the unsuspecting recipients of Defendants' defective Device. Defendants' outrageous conduct warrants an award of punitive damages.

**FOR A SECOND CAUSE OF ACTION**
**NEGLIGENCE**
**AS TO ALL DEFENDANTS**

63. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

64. Defendants had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device, including a duty to assure that the Device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

65. Defendants failed to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device in that Defendants knew or should have known that the Device created an unreasonable risk of harm to patients who used the implanted device in ordinary daily activities in a manner Defendants might have reasonably expected.

66. The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a) In failing to adequately design the Device, including but not limited to the porous plasma coating of the Mini Baseplate to achieve reliable integration;

11

b) In failing to conduct adequate pre-market and post-market testing;

c) In failing to implement feasible design improvements despite knowledge of recurring failures;

d) In failing to take appropriate corrective action upon receiving adverse event reports and recall data establishing a pattern of failures;

e) In failing to warn consumers of the failure risks of the Device including risks that were not obvious and that could not be discovered through the exercise of ordinary care; and

f) In continuing to manufacture, market, distribute, and sell the Device despite actual knowledge of its propensity to fail.

67. Defendants were negligent by failing to exercise reasonable care in the design, materials selection, manufacture, testing, and preparation of the product for market, of the Device which created an unreasonable risk of harm to patients who used the implanted device in ordinary daily activities in a manner Defendants might have reasonably expected.

68. As the recipient of Defendants' Device, Plaintiff experienced failure of the Device while performing ordinary daily activities and while using his shoulder in a manner which should have reasonably expected by Defendants.

69. The Device failed inside Plaintiff's left shoulder during ordinary use, as the result of the negligence of Defendants in the design, selection of materials, manufacture, testing and preparation of the device for market.

70. As a direct and proximate result of Defendants' breaches of care, Plaintiff experienced and/or will experience severe harmful effects including but not limited to, loss of range of motion as well as other severe and personal injuries which are permanent and lasting in nature, physical

12

pain and suffering, emotional distress and mental anguish, including diminished enjoyment of life, and permanent physical impairment.

**FOR A THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**AS TO ALL DEFENDANTS**

71. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

72. Defendants designed, manufactured, tested, marketed and distributed the Device that was implanted into Plaintiff's left shoulder on January 4, 2023.

73. Defendants expressly warranted that the Device was as a safe and effective shoulder replacement system and device that would perform under normal conditions and stress placed on the shoulder.

74. Defendants made numerous representations about the quality, safety, effectiveness and expected lifetime of the Device which form express warranties.

75. Plaintiff was a person who was reasonably expected to use and rely upon the Device and Defendants' warranties.

76. The Device placed into the stream of commerce by Defendants did not confirm to these express representations because it failed and caused serious injury to the Plaintiff when used as intended, thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the Device with risks of further complications.

77. Defendants' breach of warranty was a direct and proximate cause of Plaintiff's injuries and damages as set forth more fully herein.

13

**FOR A FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**AS TO ALL DEFENDANTS**

78. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

79. Defendants designed, manufactured, tested, marketed and distributed the Device that was implanted into Plaintiff's left shoulder on January 4, 2023.

80. At the time Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the Device, Defendants knew the use for which the Device was intended and impliedly warranted the Device to be of merchantable quality.

81. Plaintiff was a person reasonably expected to use the Device and reasonably relied upon the skill and judgment of Defendants as to whether the Device was of merchantable quality.

82. Contrary to Defendants' implied warranties, the Device was not of merchantable quality or safe for the ordinary purposes for which it was to be used, because the Device was unreasonably dangerous and/or not reasonably fit for its intended, anticipated or reasonably foreseeable use as described above.

83. As a direct and proximate result of Defendants' breach of implied warranties regarding the safety and effectiveness of the Device, Plaintiff was forced to undergo further surgery to replace the faulty device, suffered significant injuries and damages, including but not limited to physical injury, economic loss, pain and suffering, and will continue to suffer such damages in the future.

84. Defendants' conduct was willful, wanton, and in conscious disregard of the rights and safety of Plaintiff and warrants an award of punitive damages. Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, attorney's fees and costs, and all such other relief as this Court deems proper.

## FOR A FIFTH CAUSE OF ACTION
## LOSS OF CONSORTIUM AS FOR PLAINTIFF MADELIN SCHWITZKE

85. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

86. At all times relevant, Plaintiff Bryan Schwitzke and Madelin Schwitzke were lawfully married.

87. As a direct and proximate result of the actions and/or omissions of Defendants and th resulting injuries and damages sustained by Plaintiff Bryan Schwitzke as describe herein, Plaintiff Madelin Schwitzke has suffered, and will continue to suffer in the future, a loss of comfort, society, companionship, affection, service, contribution, and aid of Plaintiff Bryan Schwitzke, all to her detriment.

88. Plaintiff Madelin Schwitzke is entitled to recover damages for such loss in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, attorney's fees and costs, and all such other relief as this Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants on each of the above-referenced claims as for actual and compensatory damages; future damages; pre and post judgment interest as provided by law; punitive damages, attorney's fees and costs; and any such other and further relief as this Court deems just and proper.

15

## <u>DEMAND FOR JURY TRIAL</u>

The Plaintiffs demand a jury trial on all claims so triable IN THIS CIVIL ACTION, as

provided by Rule 34(b) of the Federal Rules of Civil Procedure.


Respectfully submitted,

<u>s/ Catherine F. Juhas</u>
Catherine F. Juhas, Esquire
Fed I.D. No.: 11402
CFJ Injury Lawyers, LLC
2185 Ashley Phosphate Rd.
P.O. Box 60068
N. Charleston, SC 29419
Phone: (843) 553-0007
Fax: (843) 553-1400


<u>s/ Ivey B. Franklin</u>
Ivey B. Franklin, Esquire
Fed I.D. No.: 13248
Franklin Legal Solutions, LLC
P.O. Box 51468
Summerville, SC 29485
Phone: (843) 619-0227
Fax: (843) 808-6994

***Attorneys for Plaintiffs***

May 15, 2026
North Charleston, South Carolina


16